2004 ME 139

**Robert B. MURCH, personal representative of the Estate of Rita S. Murch**

v.

**Bonnie Sue NASH.**

Supreme Judicial Court of Maine.

Submitted on Briefs: June 24, 2004.

Decided: Nov. 9, 2004.

Clifford H. Goodall, Dyer Goodall and Federle, L.L.C., Augusta, for plaintiff.

James E. Patterson, Patterson Law Office, Ellsworth, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Bonnie Sue Nash appeals from a judgment entered in the Superior Court (Hancock County, *Mead, J.*) granting Maynard H. Murch injunctive relief and declaring that Nash has no right to use a private right-of-way across Murch's property on Great Cranberry Island.[1] Nash contends, inter alia, that the trial court erred in concluding that she failed to establish (1) a private easement by implication, and (2) an easement by necessity. We conclude that Nash established the existence of a private easement by implication and, to that extent, vacate the judgment.

## I. BACKGROUND

[¶ 2] Nash recently built an oceanfront summer residence on Great Cranberry Island on a parcel of land that is surrounded by Murch's property on three sides, and by tidal shoal water on the fourth side. Nash currently accesses her property by powerboat from the mainland at Southwest Harbor or Northeast Harbor. She travels approximately three and one-half nautical miles via Cranberry Harbor to her wharf and floating dock, which extend over 100 feet from her property. The property is also accessible by boat from nearby private boat taxi service docks at Spurling Cove on Great Cranberry and Hadlock Cove on Little Cranberry.[2]

[¶ 3] At mean low tide, at least two feet of navigable water exists within 200 yards of Nash's property, where she has moorings. Her dock is accessible at most tide levels. Her twenty-two-foot powerboat can float at the dock for approximately fourteen to sixteen hours per day, and a dingy is able to float at the dock for about twenty hours per day.

[¶ 4] There is a private right-of-way approximately one mile long that abuts Nash's property, runs across Murch's

---

1. The complaint was filed by and in the name of Rita S. Murch. The Superior Court subsequently granted a motion to substitute Maynard H. Murch as the plaintiff in his capacity as attorney-in-fact for Rita S. Murch. We granted a subsequent motion to substitute Rita S. Murch's personal representative, Robert B. Murch, as the plaintiff/appellee in his capacity as personal representative of the Estate of Rita S. Murch.

2. Electric power was supplied to her property by underwater cable from Mount Desert Island after Murch refused to grant Nash a utility easement. After Murch denied construction crews use of a road, a barge transported materials and the construction crews for the residence directly to Nash's property.

property, and leads to a public road. The right-of-way runs in a southerly direction from Fish Point to and over a northern sandbar that connects to a mass of land between waters known as "The Pool" and "The Gut." The right-of-way then travels across that land, over a southern sandbar, and onto the main part of Great Cranberry until it connects with a town road. The following illustration is drawn from Nash's exhibit # 14, and the labels are based, in part, on Murch's exhibit # 2.[3]

Portion of
Great Cranberry Island

[¶ 5] The last time that the right-of-way from Nash's property to the public road was on property owned by a common owner was in 1792. In that year, Margaret Stanley acquired all the land north of the southern sandbar, and Aaron Bunker acquired the land south of the southern sandbar. In 1878, the Hancock County Probate Court partitioned the Stanley property into twenty-seven lots in accordance with the "Stanley report to the Judge of Probate" and as depicted on what is known as the "Hamor plan."

[¶ 6] All twenty-seven lots on the Hamor plan included express easements for "shore privileges" on Fish Point and ac-

cess to a well near Fish Point. Nash's lot corresponds to lot number one on the Hamor plan, and Nash's deed contains the express easements first written into the Hamor plan. From a series of acquisitions, Murch now owns all of the land abutting the Bunker Road and the Stanley Road, with the exception of Nash's property and, possibly, a parcel owned by a third party.

[¶ 7] The Stanley report to the Judge of Probate conveyed the lots shown on the Hamor plan to Mary D. Stanley and the eight other heirs of Thomas Stanley, including Mary and Thomas's son, Abraham C. Stanley:

---

**3.** The exhibits do not refer to the two main segments of the right-of-way as the Stanley Road and the Bunker Road as indicated in the illustration. These labels are employed in this opinion for the sole purpose of distinguishing the two segments.

We hereby assign and set off to the several heirs or owners hereafter named as their full proportional shares of said estate as follows, viz:

To Mrs. Mary D. Stanley widow of the late Thomas Stanley, Lots No. 10 and 27 connected to the aforesaid two acres, together with wood-house and the western third part of the *barn with the right in common with the other heirs to the use of the shore privileges, so called on the fish point,* value thereof aside from the house and two acres of land aforesaid, five hundred and seventeen dollars, it being one third of the whole value. Reserving thereon the family burial ground two rods square, and *granting the other heirs in common with her to the right of way and use of the well thereon.* For a more full description refer to the plan (drawn by Mr. Eben M. Hamor the surveyor and artist) on file in the Probate Office.

. . . .

To Abraham C. Stanley the 2nd son, Lots No. 1 and 26 and 1/9 of 2/3 of the barn in common with the other heirs also the right and use of the well, and of the shore privileges on the fish point, in common with the other heirs . . . .

(emphasis added).

[¶ 8] The Hamor plan depicted a right-of-way (the Stanley Road) extending from Fish Point to the southern tip of what was the Stanley estate. The Stanley Road did not extend to the public road; access from the southern end of the Stanley Road to the public road required the use of a one-quarter mile road over what was the Bunker estate (the Bunker Road). An 1887 commercial atlas, known as the Colby & Stewart Atlas, depicts both of these road sections as substantially similar rights-of-way leading from Fish Point to the public road.

[¶ 9] Murch sued Nash to prevent Nash from using the road on Murch's property. Nash filed a counterclaim that sought a declaratory judgment and other relief establishing Nash's right to use the Stanley and Bunker Roads. After a trial, the Superior Court rendered a detailed decision in which it concluded that Nash had no legal right to use the road and enjoined Nash from trespassing on Murch's land. After the trial court denied Nash's motions to alter or amend the judgment, this appeal followed.

## II. DISCUSSION

[¶ 10] "We review the trial court's findings of fact for clear error and will uphold the findings 'unless there is no evidence to support them.'" *Hartwell v. Stanley,* 2002 ME 29, ¶ 10, 790 A.2d 607, 611 (quoting *Charlton v. Town of Oxford,* 2001 ME 104, ¶ 28, 774 A.2d 366, 375). "Questions of law, or legal conclusions, are subject to *de novo* review." *Murphy v. Maddaus,* 2002 ME 24, ¶ 8, 789 A.2d 1281, 1283.

### A. Private Easement by Implication Based Upon Estoppel

[¶ 11] Nash asserts that the court erred in not recognizing that she has a private easement by implication based upon estoppel in the Stanley Road ending at its southern terminus. The Superior Court, citing 23 M.R.S.A. § 3031(1),[4] con-

---

4. Subsection one of section 3031 states:
 Public Rights. From the date of recording of a subdivision plan in the registry of deeds, the public acquires rights of incipient dedication to public use of the ways laid out on the plan. If a proposed way laid out in the plan is not accepted by the municipality within 20 years from the date of recording of the plan, the public rights in that way terminate.
 23 M.R.S.A. § 3031(1) (1992).

cluded that there was no public easement by incipient dedication because there was "no evidence suggesting that the road was ever accepted by a municipality as a public road." The court did not specifically address the merits of Nash's additional claim of a private easement by implication based upon estoppel. However, it did state that even if Nash has an easement over the entire Stanley Road, the easement would abruptly end at the southern end of the Stanley Road, and would not allow Nash access to the quarter mile of Murch's land (the Bunker Road) to connect with the public road. Thus, the court's analysis considered Nash's ultimate goal—namely, accessing the public road by means of the Stanley Road and the Bunker Road—in concluding that no public or private easement existed. The court did not consider Nash's alternate contention that, at the very least, she has an easement by implication from her property to the southern terminus of the Stanley Road, where it meets the Bunker Road. Nash specifically asserted this position in her motions to alter and amend the judgment and for reconsideration, which the court denied.

■ ■ [¶ 12] A grantee who acquires property by reference to a plan acquires a private right-of-way in proposed streets delineated in the plan. *Callahan v. Ganneston Park Dev. Corp.*, 245 A.2d 274, 278 (Me.1968). "The right of way in the proposed streets acquired by a grantee under such circumstances is an 'easement by implication based upon estoppel.' " *Id.* (quoting *Arnold v. Boulay*, 147 Me. 116, 120, 83 A.2d 574, 576 (1951)). " 'Such an easement is not based upon a dedication to the public. It is a private right in no way dependent upon a prospective public use.' " *Id.* (quoting *Arnold*, 147 Me. at 120–21, 83 A.2d at 576).

[¶ 13] Nash met her burden of establishing an implied easement by demonstrating that: she and her predecessors in title obtained title by deeds referring to the 1878 Hamor subdivision plan filed in the Hancock County Probate Court; the Hamor plan included a way that abuts Nash's parcel and ends, at its southern terminus, at the Bunker Road; and the way shown on the Hamor plan is substantially the same as the Stanley Road now exists.

[¶ 14] Murch does not contest any of these facts, but contends that in order for Nash to establish a private right-of-way by implication based upon estoppel, Nash was required to establish all of the elements contained in 23 M.R.S.A. § 3031(2). That section addresses private rights resulting from recorded subdivision plans:

> 2. Private rights. A person acquiring title to land shown on a subdivision plan recorded in the registry of deeds acquires a private right-of-way over the ways laid out in the plan. If a proposed, unaccepted way is not constructed within 20 years from the date of recording of the plan, and if the private rights created by the recording of the plan are not constructed and utilized as private rights within that 20–year period, the private rights-of-way in that way terminate.

23 M.R.S.A. § 3031(2)(1992).

[¶ 15] Murch concedes that Nash satisfies the two requirements set forth in the first sentence of section 3031(2):(1) that her predecessor in title acquired "rights to land shown on a subdivision plan recorded in the registry of deeds"; and (2) that the plan included a "private right-of-way over the ways laid out in the plan." He contends, however, that Nash's claim fails to satisfy the third element set forth in the second sentence, asserting that because "there is no evidence of a road having been constructed [on the former Stanley estate] within the twenty-year period provided for, . . . the private right that the Nash

parcel once had terminated long ago as provided for in [section 3031(2)]."

[¶ 16] Murch's assertion that there was no evidence that the road on the Hamor plan was ever constructed fails to account for the 1887 Colby & Stewart Atlas that was received into evidence; nor does it account for the testimony and recent survey and photographic evidence detailing the existence of a similar road today. The Atlas shows that the Stanley Road was in existence as of 1887, less than twenty years after the filing of the Hamor plan in 1878. In addition, the surveyor's plan entitled "LAND OF RITA S. MURCH" details the road as it existed in 2002. The road follows a course nearly identical to that shown in the 1878 Hamor plan and the 1887 Atlas. A commercial atlas is competent historical evidence of the presence of a right-of-way on the face of the earth. *See Piper v. Voorhees*, 130 Me. 305, 308, 155 A. 556, 558 (1931) (finding a Maine Historical Society map admissible to prove remote facts of general history, including the route of a ferry road near the shore); M.R. Evid. 803(16) (allowing ancient documents to prove asserted facts).

[¶ 17] We conclude that the court should have considered whether Nash established a private easement extending to the southern terminus of the Stanley Road by virtue of the Hamor subdivision plan, notwithstanding its conclusion that Nash could not prove the existence of an easement that would continue to the public road by continuing across the southern sandbar and the Bunker Road. Because

the evidence compels a finding of a less extensive private easement, we vacate the court's judgment and remand for the entry of a judgment establishing Nash's private easement by implication based upon estoppel to the southern terminus of the Stanley Road.[5]

B. Easement by Necessity

[¶ 18] Nash also contends that the court erred in concluding that she does not have an easement by necessity in both the Stanley Road and the Bunker Road, extending to the southern terminus of the Bunker Road, where it connects with the public road. An easement by necessity is created "when a grantor conveys a lot of land from a larger parcel, and that conveyed lot is 'landlocked' by the grantor's surrounding land and cannot be accessed by a road or highway." *Frederick v. Consol. Waste Servs., Inc.*, 573 A.2d 387, 389 (Me.1990). "The creation of an easement by necessity depends ... on only three elements: (1) the conveyance of a lot out of a larger, divided parcel; (2) a lack 'for all practical purposes' of access to the conveyed lot; and (3) the availability of relief in the form of an easement across the retained land of the conveyor." *Amodeo v. Francis*, 681 A.2d 462, 465 (Me.1996).

[¶ 19] Nash asserts that she has met all of the requirements for an easement by necessity. She contends that her current water access amounts to unrealistic and unreasonable access because her floating dock is inaccessible for four hours per day, her twenty-two-foot boat cannot access the dock for ten hours per day, her floating dock must be removed each fall before the

---

5. We do not accept Murch's contention that Nash failed to prove the existence of the Stanley Road within twenty years of the recording of the subdivision plan as required by section 3031(2). Therefore, we do not address Nash's counter assertion that she was not required to prove full compliance with all of

the elements of section 3031(2) because the Hamor plan was recorded with the Hancock County Probate Court, and not in the Hancock County Registry of Deeds, and section 3031(2) only governs subdivision plans recorded in a "registry of deeds."

water freezes, and traveling over the exposed mud flats at low tide is very difficult.

 [¶ 20] Land abutting navigable water is generally not entitled to an easement by necessity over neighboring land. *See Kingsley v. Gouldsborough Land Improvement Co.*, 86 Me. 279, 281–82, 29 A. 1074, 1074 (1894). This is so because navigable water is considered a public highway, and therefore, land accessible by navigable water cannot be landlocked. *Littlefield v. Hubbard*, 124 Me. 299, 301, 128 A. 285, 286–87 (1925). Land abutting navigable water is not entitled to an easement by necessity simply because water access to the parcel is inconvenient. *Id.* Necessity does not mean, however, "that there must exist an absolute physical impossibility of otherwise reaching the alleged dominant estate. When a way exists, but the expense to be incurred in utilizing it is grossly in excess of the total value of the estate itself, an easement of necessity is sometimes recognized." *Id.* at 302, 128 A. at 287; *see also Morrell v. Rice*, 622 A.2d 1156, 1159–60 (Me.1993) (finding that an oceanfront parcel was entitled to an easement by necessity because it was unreasonable for water passage to be the only access to the property where navigable water at low tide was approximately 1000 yards from the parcel, obtaining an environmental permit to dredge a channel would have been unlikely, dredging a channel would cost about $300,000, and the tidal marsh froze in the winter).

[¶ 21] The evidence concerning water access to Nash's property was largely uncontested and indicates that Nash has reasonable access to her property for all practical purposes: Nash has access to utilities via underwater cable from Mount Desert Island; she built and maintains a 100–foot wharf and floating dock to access her property; construction supplies for Nash's house were delivered by barge to her property; she can access her dock by skiff twenty hours per day and by powerboat fourteen to sixteen hours per day; and Nash currently plans her water transportation to and from the mainland based on the tides. Furthermore, Nash has deeded access at all tides to Fish Point. Therefore, the court did not err in concluding that Nash had failed to establish an easement by strict necessity.

[¶ 22] We find Nash's remaining arguments to be without merit and decline to address them.

The entry is:

Judgment vacated in part and affirmed in part. Remanded for entry of judgment in favor of Nash establishing a private easement by implication based upon estoppel over the right-of-way from Fish Point to the southern terminus of the Stanley Road. The judgment is affirmed in all other respects.